# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

No. 03-3364

United States of America, *
*
Plaintiff/Appellee, *
*
v. *
*
Jaime Eleazar Bustos-Torres, *
*
Defendant/Appellant. *

CR 02-358(1) JMR/FLN

No. 03-3365

Appeals from the United States District Court for the District of Minnesota.

United States of America, *
*
Plaintiff/Appellee, *
*
v. *
*
Armando Magallan-Alfaro, *
*
Defendant/Appellant. *

Submitted: May 13, 2004
Filed: February 2, 2005

SCANNED
JUN 20 2005 DG
U.S. DISTRICT COURT ST. PAUL

Before WOLLMAN, HAMILTON,[1] and BYE, Circuit Judges.

---

BYE, Circuit Judge.

A jury convicted Jaime Eleazar Bustos-Torres and Armando Magallan-Alfaro of one count of conspiracy to distribute and possess with intent to distribute more than 500 grams of methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A), and one count of aiding and abetting possession with intent to distribute more than 500 grams of methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and 18 U.S.C. § 2.

On appeal, each defendant challenges the legality of the vehicle stop leading to their arrest and appeals the district court's[2] denial of their motion to suppress the fruits of the allegedly illegal stop. Mr. Alfaro also argues the district court erred when it granted Mr. Torres's motion to be absent from the trial, admitted testimony to the effect Mr. Alfaro asked the witness to sell drugs, denied Mr. Alfaro's motion for judgment of acquittal based on insufficiency of the evidence, made extraneous comments prejudicial to his defense, and refused to give him a minor-role reduction.

The legality of the initial stop and subsequent seizure of $10,000 from Mr. Alfaro's pockets represents a close issue in this case. After carefully examining the arguments and facts, we affirm on all grounds.

---

[1]The Honorable Clyde H. Hamilton, United States Circuit Judge for the Fourth Circuit, sitting by designation.

[2]The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota.

# I

In 2002, Ramsey County (Minnesota) Deputy Sheriff Eric Bradt was a seven-year veteran in the special-investigations unit. As such, he had received training in narcotics recognition, detection, and enforcement.

## A. Déjà Vu

On October 16, 2002, Deputy Bradt sat in an unmarked vehicle in the parking lot of Awada's Lounge in West St. Paul, Minnesota. He was conducting surveillance to execute an arrest warrant on a dangerous fugitive in an unrelated case. Though Deputy Bradt was not personally familiar with Awada's, he knew other officers considered it to be in an area of high drug traffic. Shortly after five in the afternoon, as evening invaded the city, two separate scenes unfolded while he waited for his suspect.

First, a vehicle occupied by two Hispanic males pulled into a nearby parking space. The driver emerged and made his way along one side of the establishment. From around a corner, a stocky Hispanic male in a white cap, later identified as Antonio Thelen, appeared and met briefly with the driver. As the driver and Mr. Thelen conversed in front of the vehicle, Deputy Bradt observed the driver hand Mr. Thelen money in exchange for a plastic "baggie." Deputy Bradt could discern neither the amount of the money nor the contents of the baggie, but he was certain, based on his knowledge and experience, he had just witnessed a narcotics transaction. Because he was on surveillance, however, he did not interfere with the transaction, but rather observed Mr. Thelen disappear behind a corner toward Awada's door and the vehicle drive off into the night.

In the few minutes that followed, Deputy Bradt received information that the fugitive would not be appearing in the vicinity of Awada's. As Deputy Bradt then

terminated the surveillance, he observed a maroon Chevrolet Lumina occupied by three Hispanic males enter the parking lot. Mr. Thelen reappeared from behind the corner and approached the vehicle. This time, however, he joined the three men inside the vehicle, so that Deputy Bradt could not discern what transpired between them. Within a few minutes, Mr. Thelen reemerged and returned to Awada's, and the vehicle again drove off into the streets. No longer committed by the surveillance and suspecting another drug buy had taken place, Deputy Bradt followed the Lumina out of the parking lot and called for backup.

B. The Stop and Search

Backup joined Deputy Bradt within a mile of Awada's, and the officers made an investigatory stop of the Lumina. Mr. Torres was the driver, Mr. Alfaro occupied the front passenger's seat, and Jesus Sanchez sat in the back. The officers asked the three men to come out of the car, conducted a pat-down search for weapons, and discovered $10,000 in Mr. Alfaro's pockets. All three suspects were then arrested.[3] With the assistance of Sergeant Craig Palmer, Sergeant Robert Pavlak conducted the pat-down search of Mr. Alfaro.

While conducting an inventory search of the Lumina, the officers discovered a substance appearing to be cocaine in a film container on the front passenger's door panel. During booking, officers also found, in Mr. Alfaro's possession, a key and a receipt for room 320 of the Extended Stay America Hotel in Woodbury, Minnesota.

---

[3]In his rebuttal at oral argument, Mr. Alfaro argued for the first time that the arrest preceded the pat-down search which uncovered the $10,000. We find no evidence in the record to support this argument. Both at the suppression hearing and at trial, officers testified they first stopped the vehicle, then searched the occupants, then placed them under arrest, and finally conducted the *vehicle* search. See Suppression Hearing Transcript at 42-44; Trial Transcript at 114-15, 148, 157-58, 165-66.

Deputy Bradt called the hotel and confirmed Mr. Alfaro was a registered guest. Sergeant Roland Martinez then spoke with Mr. Alfaro in Spanish and received his consent to search the room.

The search of room 320 resulted in the seizure of a black gym bag containing Mr. Torres's identification, a pair of pants in Mr. Torres's size, large amounts of cash,[4] and twelve pounds of methamphetamine wrapped in cellophane packages. Officers also discovered latent fingerprints on the drug packaging. One of these fingerprints matched Mr. Torres's.

The officers also discovered a zip-lock bag of cocaine hidden behind a dresser, drug notes including a notation of $10,000, and a money-transfer receipt belonging to Mr. Alfaro.

C. Unusual Pre-Trial and Trial Occurrences

Mr. Torres sought to enter a conditional guilty plea preserving the right to appeal the denial of his pretrial motion to suppress. Pressing for an unconditional plea, the government decided to try the case. Mr. Torres then preferred to stay in his prison cell and entered a pretrial motion to be absent from the trial. The district court granted the motion and directed from the bench that Mr. Torres receive a three-level reduction for acceptance of responsibility pursuant to § 3E1.1 of the United States Sentencing Guidelines (U.S.S.G.).

Pursuant to Federal Rule of Evidence 404(b), the government made a pretrial motion to admit the testimony of Ramon Villanueva as evidence of Mr. Alfaro's prior involvement in the drug trade. The district court denied the motion without prejudice.

---

[4]The parties' briefs reflect different amounts, but in every case the amount is in the thousands of dollars.

At trial, the government made an offer of proof by putting Mr. Villanueva on the stand outside the jury's presence. The court then permitted Mr. Villanueva to testify about a conversation in which the defendants had hinted to him he could sell drugs for them.

As he was dismissing the jury for deliberations, the district court explained:

> Now members of the Jury, as you go to deliberations, the instructions that have just been read to you will be provided to you along with the original verdict forms, along with the indictment in the case. We will inventory the exhibits, and the exhibits will be provided to you except for the actual drugs that are involved in the matter. The drugs are available for your examination, if you actually desire to do so, but we would request that you make a special [sic] for that and we would actually do the examination here in the courtroom. *There are several reasons for that, but one that leads them all, is frankly, they don't smell very well in a small room.* But you will have the rest of the exhibits momentarily.

Trial Transcript at 469 (emphasis added).

D. Mr. Alfaro's Testimony

Mr. Alfaro testified as follows regarding his presence outside Awada's on the evening of the arrest. He drove to Minnesota alone (apparently from California) to buy two pick-up trucks; Mr. Torres, a friend from California, was to join him later. Mr. Alfaro first stayed at another hotel for a week and then moved to the Extended Stay in Woodbury. When Mr. Torres first arrived in Minnesota, he carried his belongings in a small gym bag. About two days later, Mr. Torres brought to the hotel room the black bag in which the authorities discovered the methamphetamine. Mr. Alfaro testified he never looked inside the black bag and was unaware of its contents until after the police search.

He also testified regarding the $10,000 he had in his pockets the evening of the arrest. He received $3,500 in Mexican pesos from a Mexican acquaintance as down payment for one of the trucks he had come to buy. Another $5,000 was the payment he had received from a woman in California who owed him the money and had just refinanced her house.

Finally, Mr. Alfaro explained he and Mr. Torres left the hotel to look for trucks at 9:00 a.m. the day of the arrest. At some point, Mr. Torres obtained the cocaine later found in the car, and they picked up Mr. Sanchez, a friend of Mr. Torres's. Because Mr. Torres received a call from someone inviting them to have a drink, they stopped looking for trucks at about 5:00 p.m. and headed to Awada's. Mr. Alfaro did not notice what, if anything, occurred in the back seat when Mr. Thelen boarded the vehicle.

E. Minor Role Reduction

Mr. Alfaro objected to the Pre-Sentence Report (PSR), arguing he was entitled to a role reduction under U.S.S.G. § 3B1.2 for playing either a minor or minimal role in the conspiracy. The district court found Mr. Alfaro was an average participant and entered a sentence without the reduction.

II

The defendants' challenge to the stop and search poses an interesting analytic problem and represents the closest issue in this case. After painstaking analysis, we conclude Deputy Bradt and the other officers acted within the lawful confines of the Fourth Amendment at each stage of their encounter with the defendants.

We review de novo a district court's legal conclusion that the authorities had a reasonable suspicion justifying a Terry stop, and review for clear error a district

court's findings of fact, giving due weight to the inferences police drew from those facts. United States v. Ramirez, 307 F.3d 713, 716 (8th Cir. 2002). Mr. Alfaro and Mr. Torres challenge the legal conclusion Deputy Bradt possessed a reasonable suspicion to stop the car.[5]

Law enforcement officers may make an investigatory stop if they have a reasonable and articulable suspicion of criminal activity. Terry v. Ohio, 392 U.S. 1, 25-31 (1968). A reasonable suspicion is a "particularized and objective" basis for suspecting the person who is stopped. United States v. Thomas, 249 F.3d 725, 729 (8th Cir. 2001). "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." United States v. Halls, 40 F.3d 275, 276 (8th Cir. 1994) (citation omitted). In short, the government must point to specific, articulable facts that reasonably suggest a crime. Terry, 392 U.S. at 27.

In this case, the district court relied upon the following facts to arrive at the conclusion Deputy Bradt had a reasonable suspicion to make the stop: (1) the defendants and Mr. Thelen met in a location known to law enforcement as a hotbed for drugs; (2) Deputy Bradt witnessed a vehicle pull into the parking lot, Mr. Thelen emerge from Awada's and take part in an apparent drug deal with the occupants, and the vehicle drive away, all within a few minutes; and (3) Deputy Bradt witnessed the same sequence of events when the Lumina appeared, with the critical difference that

[5]The government argues the defendants' encounter with Mr. Thelen created *probable cause*. Perhaps the government is concerned about the legality of the eventual search after the stop. If the defendants' conduct at Awada's raised probable cause, then the officers could lawfully stop *and* search the defendants. A Terry stop based on reasonable suspicion, on the other hand, justifies at most a stop and frisk. Though we doubt the defendants' contact with Mr. Thelen gave rise to probable cause, we do not reach the question.

Mr. Thelen entered the car and Deputy Bradt could not see what took place there between Mr. Thelen and the defendants.

The defendants argue the district court's reasoning transforms into a suspect anyone who associated with Mr. Thelen after the first transaction. They ask whether a person who happened to go into the men's room at the same time as he would also come under reasonable suspicion. Perhaps more compelling is defendants' argument Deputy Bradt absolutely would have lacked reasonable suspicion had the second encounter not followed the first, even in a location known for drug sales.

Stimulating as it may be, we would not entertain the hypothetical over the actual. The defendants' arrival at Awada's *did* follow the scene of a probable drug deal. By then, a reasonable officer witnessing the first scene would have had a reasonable suspicion Mr. Thelen dealt drugs from Awada's and sold drugs to the occupants of the first vehicle. The essential question then is whether the occupants of the second vehicle also should have come under suspicion.

We think they should. The defendants' arrival and Mr. Thelen's career not only followed but also largely reenacted in parallel the events of the first scene. Mr. Torres and Mr. Alfaro entered the parking lot in an automobile, Mr. Thelen emerged from around a corner and walked along one side of Awada's, one of the vehicle's occupants made contact with him, he interacted with the occupants, and the car drove off without satisfying any purpose at Awada's other than to meet briefly with a then-suspected drug dealer. As with the first scene, these events occurred within a matter of minutes in a location notorious for drug traffic.[6]

---

[6]According to the government's brief, the defendants' "demeanor" also aroused Deputy Bradt's suspicion. Because the word "demeanor" strikes us as vague, we reach our conclusion without taking it into account.

A more useful hypothetical would have us suppose Mr. Thelen engaged in, not one, but several transactions before the defendants appeared. In such a case, it would be unreasonable to argue Deputy Bradt was unjustified in stopping the Lumina, for after observing a series of deals, any reasonable officer would sensibly infer the occupants of the Lumina were also buyers. While the inference is attenuated in this actual case, it seems to us not an "inchoate and unparticularized suspicion or hunch" but rather a "specific reasonable inference[] which [Deputy Bradt] was entitled to draw from the facts in light of his experience." Terry, 392 U.S. at 21. Put simply, an experienced narcotics officer reasonably would have believed the second car, like the first, was likely on the scene to buy drugs. And he could point to the location and the first transaction as the articulable facts giving rise to his suspicion. Accordingly, we hold the officers properly made a Terry stop of the defendants' vehicle prior to their arrest.

Mr. Torres and Mr. Alfaro also challenge their arrest, but they do so only in conclusory terms without specifying which of the officers' actions were unlawful. We hold the officers had probable cause to make the arrest once they discovered Mr. Alfaro was carrying $10,000 in his pockets while leaving the scene of a suspected drug deal. Thus, the search of the vehicle was legal and all the evidence discovered therein was admissible.

To take issue with the officers' conduct, rather, one must turn back to the discovery and seizure of the cash itself. During a Terry stop, "[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," the officer may conduct a pat-down search "to determine whether the person is in fact carrying a weapon." Terry, 392 U.S. at 24. Because weapons and violence are frequently associated with drug transactions, it is reasonable for an officer to believe a person may be armed and dangerous when the person is suspected of being involved in a drug transaction. United States v. Robinson, 119 F.3d 663, 667 (8th Cir. 1997).

In this case, not only did the officers suspect the defendants had been involved in a drug transaction, the officers also had to confront three unknown men in the early evening in a place known for its drug activity. After considering the totality of these circumstances, we conclude the decision to conduct the pat-down search was proper under the Fourth Amendment. This conclusion, however, does not end the inquiry.

Rather, the issue narrows to whether Sergeant Pavlak, the officer who conducted the search, was justified in *seizing* the cash in Mr. Alfaro's pockets. While the "purpose of a pat-down search is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence," and while the search must therefore "be strictly limited to that which is necessary for the discovery of weapons which might be used to harm the officer or others nearby," Minnesota v. Dickerson, 508 U.S. 366, 373 (1993) (internal citations and quotations omitted), officers may lawfully seize contraband they incidentally discover in "plain touch" during a Terry frisk.

In Dickerson, the Supreme Court established the "plain touch" or "plain feel" concept as an analogue to the plain-view doctrine. Id. at 375-76. It is settled that an officer, without a warrant, may seize an object in plain view provided the officer is lawfully in the position from which he or she views the object, the object's incriminating character is immediately apparent, and the officer has a lawful right to access the object. Id. at 375. The plain-view doctrine "has an obvious application by analogy to cases in which an officer discovers contraband through the sense of touch during an otherwise lawful search." Id. The Court described this analogy as follows:

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is *contraband*, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.

Id. at 375-76 (emphasis added).

While Dickerson's holding refers specifically to contraband, we do not doubt the plain-touch doctrine extends to the lawful discovery of any incriminating evidence, not just contraband such as drugs. See United States v. Hernandez-Rivas, 348 F.3d 595, 599 (7th Cir. 2003) (tacitly recognizing plain-touch doctrine would justify seizure of $10,000 in cash); United States v. Miles, 247 F.3d 1009, 1013 (9th Cir. 2001) ("[I]f an officer feels an item that he recognizes as contraband or *evidence*, that touch may provide probable cause for the arrest of the person and seizure of the *evidence*." (emphasis added)). Indeed, in the footnote that follows the Dickerson block quotation we have just cited, the Court explains "[t]he police officer in each case [plain view or plain touch] would have had a prior justification for an intrusion in the course of which he came inadvertently across a *piece of evidence* incriminating the accused." Id. at 376 n.3 (emphasis added).[7]

We have established the officers in this case lawfully stopped the Lumina and conducted the pat-down search of its occupants. In the course of frisking Mr. Alfaro for weapons, Sergeant Pavlak came across two wads of bills in Mr. Alfaro's pockets. There is no evidence, nor do the defendants argue, that Sergeant Pavlak rummaged through Mr. Alfaro's pockets or otherwise expanded the circumscribed protective search beyond the scope authorized by Terry. Rather, in the course of properly frisking Mr. Alfaro for weapons, the Sergeant came across the objects which turned out to be the stash. The only question remaining, therefore, is whether he was justified in seizing these objects as they came into "plain touch."

---

[7]Despite voicing qualms about concurring in the majority opinion in Dickerson, Justice Scalia used the broader word "evidence" interchangeably with "contraband." 508 U.S. at 379-82 (Scalia, J., concurring).

Dickerson requires the officer conducting a pat-down search have probable cause to believe the item in plain touch is incriminating evidence. Dickerson, 508 U.S. at 376 ("Regardless of whether the officer detects the contraband by sight or by touch . . . the Fourth Amendment's requirement that the officer have probable cause to believe that the item is contraband before seizing it ensures against excessively speculative seizures."). To give rise to probable cause, the incriminating character of the object must be immediately identifiable. Id. at 376. That is to say, the object must be one "whose contour or mass makes its identity immediately apparent." Id.

We have now distilled the question to its very essence: Were the bills, by their mass and contour, immediately identifiable to the Sergeant's touch as incriminating evidence? Pondering the question with a dose of common sense, we believe they were. Sergeant Pavlak testified he found $6,000 in one of Mr. Alfaro's pockets and $4,000 in another. Officers also testified the cash consisted of twenty, fifty, and one-hundred dollar bills. Supposing Sergeant Pavlak first discovered the $4,000 wad and the money consisted entirely of one-hundred dollar bills, he would have come across a collection of *forty* bills, all in one pocket. We now recall the circumstances which justified the Terry stop in the first instance: The officers saw the defendants leave the scene of a suspected drug buy in an area known for drug traffic. Under these circumstances, Sergeant Pavlak had probable cause to believe the wad of papers he came across with his hand was indeed cash, and was likely evidence of the drug trade. As a result, we affirm the district court's denial of the defendants' motion to suppress the evidence.

III

A. Mr. Torres's Absence From Trial

After plea negotiations between the government and Mr. Torres broke down, the district court granted his motion to be absent from trial. Rule of Criminal

Procedure 43 permits a defendant to waive his continued attendance at trial once the trial has started. However, the Rule does not authorize a pre-trial waiver. Mr. Alfaro, who failed to object below, argues the district court committed plain error by granting the motion. He argues he was prejudiced by Mr. Torres's absence because the jury had only one face to associate with the inculpatory evidence presented at trial.

Because Mr. Alfaro did not object to the court's ruling below, we review the ruling for plain error only. See In re Grand Jury Subpoena as to C97-216, 187 F.3d 996, 998 (8th Cir. 1999); Fed. R. Crim. P. 52(b). To establish an error was plain, a defendant must show the error was clear, obvious, and affected his substantial rights. See United States v. Olano, 507 U.S. 725, 731-37 (1993); United States v. Tulk, 171 F.3d 596, 599 (8th Cir. 1999). Once the defendant establishes such an error occurred, the court of appeals may, in the exercise of its sound discretion, reverse or vacate the district court's judgment if the error seriously affected the fairness, integrity, or public reputation of the judicial proceeding below. Olano, 507 U.S. at 732; Fed. R. Crim. P. 52(b).

Even assuming Rule 43 is somehow meant to protect Mr. Alfaro's right to be accompanied by his co-defendant in the courtroom, we need not examine the alleged error, for we cannot fathom how Mr. Torres's absence prejudiced Mr. Alfaro at all, much less to the degree required for a finding of plain error. The co-defendants were charged with conspiracy and aiding and abetting. Had Mr. Torres pled or fled, the government could have properly introduced evidence of their joint illegal activities against Mr. Alfaro alone, and the district court would have properly permitted the trial to proceed with him sitting alone at the defendant's table. In essence, then, Mr. Alfaro challenges the joinder itself of the co-defendants; yet he fails to develop any arguments in support of this challenge. We conclude Mr. Alfaro was not prejudiced by Mr. Torres's absence and the district court therefore did not commit plain error.

B. Mr. Villanueva's Testimony

At trial, Mr. Villanueva testified regarding a casual conversation he had with the defendants, during which they "were telling me that if I could sell drugs, but I said that I couldn't because I did not know any body." Trial Transcript at 193-94. He added he permitted the defendants to park automobiles in his property and to register vehicles under his address. Mr. Alfaro objected to this testimony and now appeals its admission arguing it was unduly prejudicial and inflammatory.

We review for abuse of discretion a district court's admission of evidence of prior bad acts under Federal Rule of Evidence 404(b). United States v. Shoffner, 71 F.3d 1429, 1432 (8th Cir. 1995). Rule 404(b) provides a court may admit "evidence of other crimes, wrongs, or acts" for the purpose of proving "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Though such evidence is not admissible to prove the character of a person in order to show a propensity for criminality, id., we have held repeatedly Rule 404(b) is a rule of inclusion. United States v. Butler, 56 F.3d 941, 944 (8th Cir. 1995). Thus, we reverse "only when it is clear that the evidence has no bearing on the case." Shoffner, 71 F.3d at 1432 (quotation and citation omitted).

In this case, an element of each charged offense was Mr. Alfaro's knowledge or intent. Accordingly, the cornerstone of his defense was mere presence – a denial that he knew anything about the drugs in Mr. Torres's bag or intended to engage in drug trafficking. Evidence of Mr. Alfaro's familiarity with drug dealing, therefore, became highly probative of his mental state, and evidence of his association with Mr. Torres in the drug trade was strong circumstantial evidence of Mr. Alfaro's knowledge of the contents of the black bag. We hold the district court acted within its sound discretion when it admitted the testimony into evidence.

C. Sufficiency of the Evidence

In reviewing the sufficiency of the evidence, we view the evidence in the light most favorable to the verdict, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences (drawn from the evidence) supporting the verdict. United States v. Espino, 317 F.3d 788, 792 (8th Cir. 2003). In a nutshell, we affirm if a reasonable juror could have found the defendant guilty beyond a reasonable doubt. United States v. Harmon, 194 F.3d 890, 892 (8th Cir. 1999).

We hold the evidence supports the jury's verdict. First, the government argued Mr. Alfaro had constructive possession of the drugs found in room 320, the room he shared with Mr. Torres. The room was registered in Mr. Alfaro's sole name, and he possessed the hotel receipt and room key at the time of his arrest.

In addition, there was strong circumstantial evidence Mr. Alfaro conspired with Mr. Torres to distribute drugs. In room 320, officers found a bag of cocaine behind a dresser, drug notes in Mr. Torres's gym bag, drug packaging (cellophane) on an open counter, a money-transfer receipt belonging to Mr. Alfaro, and thousands of dollars in cash – all this in addition to the twelve pounds of cellophane-wrapped methamphetamine found in Mr. Torres's sports bag. At the time of his arrest, Mr. Alfaro possessed $10,000 in cash and was sitting next to a canister of cocaine found in the vehicle's door panel. One of the drug notes in Mr. Torres's sports bag reflected a sum of $10,000.

Finally, Mr. Alfaro's testimony must have seemed utterly incredible to the jury. He testified he traveled to Minnesota to look for and purchase two trucks. Because one of the purchases was to be for an acquaintance residing in Mexico, the jury must have been bewildered, to say the least, by his decision to travel clear to the Canadian border to buy two trucks with $10,000 in cash. Furthermore, at the time of his arrest,

he had already spent more than a week at hotels in Minnesota. The jury may have wondered how he could have profitably purchased the trucks with the expenses he must have already incurred.

Mr. Alfaro's account of the evening of his arrest seems just as implausible. According to his testimony, Mr. Torres, Mr. Sanchez, and he went to Awada's because someone telephoned Mr. Torres inviting him for drinks. When Mr. Thelen joined them in the car, he sat in the back seat with Mr. Sanchez. Still, Mr. Alfaro did not notice what transpired in the back. We suspect the jury may have doubted Mr. Alfaro's explanation for the visit to the Awada's when the party did not enter the establishment to have their drinks. The jury may have also wondered how he missed what took place immediately behind him in the car.

We conclude the government presented more than sufficient evidence to support the conviction.

D. The District Court's Extraneous Comment

Because Mr. Alfaro did not object to the judge's comment at the time it was made, we review the comment for plain error only. See Grand Jury Subpoena, 187 F.3d at 998; Fed. R. Crim. P. 52(b).

The cornerstone of Mr. Alfaro's defense was his denial of any knowledge of the methamphetamine in room 320. When the judge remarked that methamphetamine would not "smell well" in a small room, the remark indirectly undermined this defense. If the comment registered with the jurors, they may have thought, "How can Mr. Alfaro deny knowledge of the drugs if their smell would have been noticeable in the hotel room?" On appeal, Mr. Alfaro argues the judge introduced into the case prejudicial evidence which had not been admitted at trial.

While we believe the challenged comment would have been better left unsaid, we cannot say it rises to the level of plain error. Mr. Alfaro does not advance, nor do we detect, any direct, circumstantial, or even atmospheric evidence the district court consciously sought to send a signal to the jury. Instead, the comment reads more like an inadvertent slip made during the course of explaining why the drugs would not be sent to the jury room, absent a special request by the jury. More importantly, the government introduced more than sufficient credible evidence showing Mr. Alfaro was a knowing participant in the conspiracy and therefore knew about the drugs. Even if the judge's comment registered with the jury and thus constituted harmful error, we cannot say the error seriously affected the fairness, integrity, or public reputation of the trial.

E. Role Reduction

A district court's factual determination of the defendant's role in the offense may only be reversed if it is clearly erroneous. United States v. Lopez-Arce, 267 F.3d 775, 784 (8th Cir. 2001). It is the defendant's burden to prove that he warrants a role reduction. Id.

Mr. Alfaro argues he played a smaller role than Mr. Torres in the conspiracy and therefore deserves a role reduction. Even a defendant decidedly less culpable than his co-defendants, however, is not entitled to a reduction if he was deeply involved in the offense of conviction. United States v. Alvarez, 235 F.3d 1086, 1090 (8th Cir. 2000). The evidence sustaining Mr. Alfaro's conviction clearly establishes he was deeply involved in the conspiracy to distribute methamphetamine. Therefore, the district court did not commit clear error when it denied Mr. Alfaro's motion for a role reduction, and we affirm the sentence.

## IV

We affirm the district court's judgment in all respects.

**UNITED STATES COURT OF APPEALS**
**FOR THE EIGHTH CIRCUIT**
THOMAS F. EAGLETON COURT HOUSE
ROOM 24.329
111 S. 10TH STREET
ST. LOUIS, MISSOURI 63102

MICHAEL E. GANS
Clerk of Court

VOICE (314) 244-2400
FAX (314) 244-2780
www.ca8.uscourts.gov

June 17, 2005

RECEIVED
BY MAIL
JUN 20 2005
CLERK, US DIST. COURT
ST. PAUL, MN

Mr. Richard Sletten
Clerk
U.S. DISTRICT COURT, MINNESOTA
708 Federal Building
316 N. Robert Street
St. Paul, MN 55101

Re: 03-3364 United States vs. Jaime Bustos-Torres

Dear Clerk:

The mandate of this Court is being sent to the clerk of the district court, together with a receipt. The clerk of the district court is requested to sign, date, and return the receipt to this office.

Any district court records in this court's possession will be returned shortly.

(5175-010199)

Sincerely,

Michael E. Gans
Clerk of Court

dms

Enclosure

(LETTER FOR INFORMATIONAL PURPOSES ONLY)

---

cc: Honorable James M. Rosenbaum
Honorable Paul A. Magnuson
Ann M. Anaya
James Edward Lackner
Jaime Eleazar Bustos-Torres
Arthur Ray Martinez

District Court/Agency Case Number(s): CR 02-358-01 JMR/FLN